**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

---

|  |  |  |
|---|---|---|
| DAVID LIBRACE, *et al.,* | ) | |
| | ) | |
| *Plaintiff,* | ) | Civil Action No: 4:16-CV-00057 |
| | ) | |
| v. | ) | |
| | ) | |
| MARK MARTIN, *et al.,* | ) | |
| | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

---

| **DEFENDANT SENATOR MARCO RUBIO'S** |
|---|
| **MOTION TO DISMISS COMPLAINT** |

Pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(5) and 12(b)(6), Defendant Senator Marco Rubio moves this Court to dismiss the Complaint because the Plaintiff lacks standing; the Complaint raises a non-justiciable political question; service of the Complaint has not occurred and if it did, service was procedurally deficient; and the Complaint fails to state a claim upon which relief can be granted.

## INTRODUCTION

This Complaint should be dismissed for four reasons. First, the Plaintiff lacks standing to bring this claim. Second, Plaintiff brings a non-justiciable claim. Third, service has not occurred and is otherwise improper. Finally, Senator Marco Rubio is a natural born citizen of the United States. It is undisputed that Senator Rubio was born in the United States. This fact alone should end any further inquiry into this matter and this Court should grant Senator Rubio's Motion to Dismiss.

1

The Plaintiff, Mr. Librace, argues that the term "natural born citizen," a constitutional term of art with a lengthy history, refers only to those persons born in the United States to parents who are both U.S. citizens. This argument has no basis in the common law of England, the common law of England as adopted in the United States, or the subsequent constitutional law of the United States. Furthermore, to adopt Mr. Librace's view would mean that at least six Presidents of the United States were not natural born citizens and were ineligible to hold that office.

Fundamentally, Mr. Librace does not possess standing to bring his claim. His alleged "harms" are, at best, derivative harms that are not cognizable injuries and have previously been declared insufficient by this Court and numerous other state and federal courts to confer standing on a litigant. Furthermore, Mr. Librace's claims are procedurally defective as the sole forum for the consideration of these claims is through the mechanisms provided for by federal law and confined to the U.S. Congress.

Additionally, Senator Rubio has not been properly served with the Complaint in this matter. As of the date of this filing, Senator Rubio has not been served by the Plaintiff with a copy of the Complaint nor with a Summons. In fact, the hearing scheduled for Monday, February 29, 2016 was brought to the attention of counsel for Senator Rubio by counsel for the Secretary of State after business hours the Friday evening before the Monday hearing.

For the reasons that follow, this Court should grant Senator Rubio's Motion to Dismiss.

**ARGUMENT**

I. **THIS COURT SHOULD DISMISS THE COMPLAINT BECAUSE MR. LIBRACE BRINGS A GENERALIZED GRIEVANCE AND PRESENTS A NON-JUSTICIABLE POLITICAL QUESTION.**

A. **Standard Of Review.**

Questions of standing and justiciability are part of the subject-matter jurisdiction analysis and are properly raised under Fed. R. Civ. P. 12(b)(1). *See Marine Equip. Management Co. v. United States*, 4 F.3d 643, 646 (8th Cir. 1993) ("Federal courts are not courts of general jurisdiction and have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto."). A federal court therefore has a duty to assure itself that the threshold requirement of subject matter jurisdiction has been met in every case. *Bradley v. Am. Postal Workers Union, AFL-CIO*, 962 F.2d 800, 802 n.3 (8th Cir. 1992).

Article III of the Constitution limits the jurisdiction of federal courts to actual cases or controversies. *See* U.S. Const. art. III, § 2. The 'case or controversy' jurisdictional requirement demands that Mr. Librace demonstrate that he has (1) "injury in fact[, or] an invasion of a legally protected interest which is"; (2) "concrete and particularized"[;] (3) "actual or imminent, not conjectural or hypothetical"[;] and (4) causation "between the injury and the conduct complained of." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Furthermore, a favorable judicial decision should be capable of providing relief from the claimed injury. *See Allen v. Wright*, 468 U.S. 737, 751 (1984). "[T]he standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Id.* at 752. If a plaintiff lacks standing, the court has no

subject matter jurisdiction. *See Faibisch v. Univ. of Minn.*, 304 F.3d 797, 801 (8th Cir. 2002) (internal citation omitted). Therefore, if Plaintiff here lacks standing, his lawsuit must be dismissed under Federal Rule of Civil Procedure 12(b)(1).

Therefore, to satisfy this requirement of standing, Mr. Librace must prove that Senator Rubio has injured him in fact, that Senator Rubio caused this injury, and that the relief Mr. Librace seeks will redress this injury. *See Lujan,* 504 U.S. at 560. Furthermore, the injury in fact element is satisfied not upon a speculative or generalized grievance but only upon the showing of an injury to a protected legal interest. *Allen*, 468 U.S. at 756. This requirement preserves the separation of powers doctrine confining the judiciary to the adjudication of actual disputes and preventing the judiciary from presiding over broad-based policy questions that are properly resolved in the legislative arena. *Id.* at 752 ("[F]ederal courts may exercise power only when adjudication is 'consistent with a system of separated powers and [the dispute is one] traditionally thought to be capable of resolution through the judicial process'" (quoting *Flast v. Cohen,* 392 U.S. 83 (1968)).

Additionally, the protected legal interest must fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question. *Ass'n of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 156 (1970).

Mr. Librace has not suffered an injury to a legally protected interest. *First*, Mr. Librace's alleged injury is not particularized to him but is a generalized grievance. *Second*, even if there is an injury, the legal interest at stake is not vested in Mr. Librace, but in the U.S. Congress. *Third*, even if this Court finds that Mr. Librace has a particular injury to a protected legal interest, this Court should still dismiss because this case presents a non-justiciable political question.

### B. Mr. Librace's Claimed Injuries Are Insufficient To Confer Standing Because He Alleges Only A Generalized Grievance And Not An Injury Specific To Him.

Mr. Librace's claim that he, as a registered voter, has suffered a particularized injury should also fail in this Court as it has similarly failed in courts across the country. Courts have held that "[A] voter fails to present an injury-in-fact when the alleged harm is abstract and widely shared or is only derivative of a harm experienced by a candidate." *Berg v. Obama*, 574 F. Supp. 2d 509, 518 (E.D. Pa. 2008).

Furthermore, this alleged harm—that Senator Rubio's presence on the ballot injures Mr. Librace—is one that is shared by every registered voter. It is not a harm sufficiently particularized to Mr. Librace. *See id*. ("The alleged harm to voters stemming from a presidential candidate's failure to satisfy the eligibility requirements of the Natural Born Citizen Clause is not concrete or particularized enough to constitute an injury in fact sufficient to satisfy Article III standing.") *aff. Berg v. Obama*, 586 F.3d 234, 240 (3d Cir. 2009) (holding that even if the plaintiff were harmed because of President Obama's placement on the ballot, the injury was too general for Article III purposes because the injury would be shared with all voters); *see also Jones v. Bush*, 122 F. Supp. 2d 713, 717 (N.D. Tex. 2000) ("A general interest in seeing that the government abides by the Constitution is not sufficiently individuated or palpable to constitute such an injury.") *aff. Jones v. Bush*, 244 F.3d 134 (5th Cir. 2000); *see also Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 221 (1974) ("[S]tanding to sue may not be predicated upon an interest of the kind alleged here which is held in common by all members of the public, because of the necessarily abstract nature of the injury all citizens share."). The U.S. Court of Appeals for the Eighth Circuit has similarly recognized that merely being a

registered voter is insufficient to confer standing. *See, e.g., Nolles v. State Comm. for the Reorganization of Sch. Dists.*, 524 F.3d 892 (8th Cir. 2008) (holding that voters lacked standing to assert a grievance shared by all registered voters of a state); *see also Crist v. Comm'n on Presidential Debates,* 262 F.3d 193, 195 (2d Cir. 2001).

Therefore, Mr. Librace's allegation that Senator Rubio's placement on Arkansas' ballot harms Mr. Librace because he is a registered voter is an "[i]mpermissible generalized grievance" and this Court must dismiss his suit for lack of subject-matter jurisdiction. *Nolles*, 524 F.3d at 899 (quoting *Lance v. Coffman*, 549 U.S. 437 (2007)) ("The Supreme Court has 'consistently held that a plaintiff raising only a generally available grievance about government–claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large–does not state an Article III case or controversy'").

C. **This Court Should Dismiss The Complaint Because Mr. Librace Brings A Non-Justiciable Political Question.**

The Twelfth Amendment to the U.S. Constitution vests Congress with the power to count electoral votes. *See* U.S. Const. amend XII. It also vests Congress with the authority to refuse to count votes for a candidate ineligible to serve in office. *Buckley*, 424 U.S. at 133-34 (noting that the Twelfth Amendment vested Congress with the same authority—judicial in nature—as Article I, § 5 which vests each congressional chamber with the power to judge the elections, qualifications, and returns of its Members). Furthermore, federal law has established a procedure for Congress to object to the electoral votes for any presidential candidate. *See* 3 U.S.C. § 15 (outlining that the procedure for objections requires the objections be made in writing, signed by one

member from each chamber and that all the objections would be voted on by the Senate and the House of Representatives). This process is also enshrined in the Twentieth Amendment to the U.S. Constitution, a process that is triggered when the President or Vice President are not qualified to serve. *See* U.S. Const. amend. XX, § 3. Therefore, the remedy that Mr. Librace hopes for is one that both federal statute and the federal constitution vest in the U.S. Congress. *See, e.g., Robinson v. Bowen*, 567 F. Supp. 2d 1144, 1147 (N.D. Cal. 2008); *see also Kerchner v. Obama*, 669 F. Supp. 2d 477, 483 (D.N.J. 2009) (holding that claims concerning President Obama's eligibility to serve as President are non-justiciable political questions and that neither U.S. Const. art. II, § 1, U.S. Const. amend. XII, nor U.S. Const. amend XX "[e]vince an intention for judicial reviewability of these political choices."); *Keyes v. Bowen*, 189 Cal. App. 4th 647, 660-661 (Cal. App. 3d Dist. 2010); *Grinols v. Electoral College*, No. 12-02997, 2013 U.S. Dist. LEXIS 6843 *10-14 (E.D. Cal. Jan. 16, 2013); *Strunk v. New York State Bd. of Elections*, No. 6500/11 2012 N.Y. Misc. LEXIS 1635 (N.Y. Sup. Ct. 2012) (holding that the "exclusive means to resolve objections to the electors' selection of a President or a Vice President" is by the raising of objections "by members of the Senate and House of Representatives" at the "meeting of the joint session of Congress" held to count Electoral College votes); *Paige v. State of Vermont, et al*. No. 780-12-15, slip op. at 2-3 (Vt. Super. Ct. Jan. 15, 2016) ('*Paige* II'); (noting that Mr. Paige's challenge to Senator Rubio's eligibility under the Natural Born Citizen Clause may present a non-justiciable political question and adopting the Court's reasoning from a 2012 opinion holding that Mr. Paige's challenge to President Obama's eligibility under the Natural Born Citizen Clause presented a non-justiciable political question); *see also Paige v. Condos and Obama*, No.

611-8-12, slip. op. at 4 (Vt. Super. Ct. Nov. 2012) ('*Paige* I') ("Here the interest in challenging the vote is largely vested in Congress through the constitutional provisions of the Twelfth Amendment and the process for members of Congress to object to the votes of the electors as they occur as described in 3 U.S.C. § 15.").

The political question doctrine requires courts to abstain from wading into disputes where the Constitution explicitly vests a "[c]oordinate political department" with the authority to act. *See Kerchner v. Obama*, 669 F. Supp. 2d 477, 482 (D.N.J. 2009) (citing *Baker v. Carr*, 369 U.S. 186, 216 (1962)). Because the Constitution vests the selection of the President to the Electoral College in Article II, § 1, U.S. Const. amend. XII, and amend. XX, § 3 and the procedures provided in these sections are specific and include procedures for both objecting and what to do when a President or Vice President fail to qualify, the political question doctrine requires that this Court abstain from deciding the case. *See id.*

Furthermore, in *Berg v. Obama*, the United States Court of Appeals for the Third Circuit indicated that the question of President Obama's qualifications under the Natural Born Citizen Clause "seemed to present a non-justiciable political question." *Berg*, 586 F.3d at 238. Indeed, in 2008, the United States Senate approved a resolution recognizing "That John Sidney McCain, III, is a 'natural born Citizen' under Article II, Section 1, of the Constitution of the United States." S. Res. 141, 110th Cong. (2008) (enacted). This resolution was introduced by six Senators, including Senator Barack Obama and Senator Hillary Clinton.

Additionally, a New York court recently reached the same conclusion. In that matter, the court explained that "Plaintiff's complaint essentially challenges the

qualifications of both President Obama and Senator McCain to hold the office of President. This is a non-justiciable political question." *Strunk v. New York State Bd. of Elections*, No. 6500/11 2012 N.Y. Misc. LEXIS 1635 (N.Y. Sup. Ct. 2012). The court held that "the exclusive means to resolve objections to the electors' selection of a President or a Vice President" is by the raising of objections "by members of the Senate and House of Representatives" at the "meeting of the joint session of Congress" held to count Electoral College votes. *Id.* The New York court continued:

> If a state court were to involve itself in the eligibility of a candidate to hold the office of President, a determination reserved for the Electoral College and Congress, it may involve itself in national political matters for which it is institutionally ill-suited and interfere with the constitutional authority of the Electoral College and Congress. Accordingly, the political question doctrine instructs this Court and other courts to refrain from superseding the judgments of the nation's voters and those federal government entities the Constitution designates as the proper forums to determine the eligibility of presidential candidates.

*Id.*

As courts across the country have previously stated, to permit various individual courts to determine whether a presidential candidate is eligible to serve as President of the United States would invite chaos in the nationwide campaign for President. This chaos would inevitably place the results of the election in 'limbo' while the courts, the appellate process and the inevitable appeal to the U.S. Supreme Court wind their way through the judicial system.

Arkansas should follow the lead of other jurisdictions across the country regarding nearly identical challenges. In those states that have reached a conclusion, courts and state agencies responsible for administering elections have also dismissed challenges to Senator Rubio's eligibility for that state's ballot for the Republican

nomination for President of the United States. *See Laity v. Rubio, et al.*, (N.Y. State Bd. Of Elec. Feb. 23, 2016); *Carter v. Rubio*, Cause 2016-2 (Ind. Election Comm'n, Feb. 19, 2016); *Graham v. Rubio*, No. 15 SOEB GP 528, slip op. at 2 (Ill. State Bd. Of Elec. Feb. 1, 2016); *Laity v. Rubio, et al.*, No. BLC 2015-4, slip op. (N.H. BLC 2015).

### D. *Purcell* Requires That This Court Refrain From Taking Any Action This Close To Election Day To Avoid Confusion And Chaos In The Administration Of Tomorrow's Election.

The Supreme Court has cautioned against judicial action on the eve of elections. The implications this would have in the state of Arkansas, where the hearing for this matter is scheduled one day prior to the Primary Election day in Arkansas' presidential preference primary are massive. Absentee ballots have been cast by potentially thousands of voters containing Senator Rubio's name. In fact, records from the Secretary of State indicate that 58,564 Republican voters had returned absentee ballots as of the morning of February 25, 2016. Early voting turnouts are setting records with thousands of ballots already cast, including double the turnout in some counties compared to 2012. *See* Tom Sissom, *Election Workers See Record Turnout*, Arkansas Online, Feb. 27, 2016.[1] The ballots are ready for Tuesday and the voting machines inspected.

The U.S. Supreme Court has expressed reluctance to issue orders that change election rules in the period just before an election because of the risk of "voter confusion and consequent incentive to remain away from the polls." *Ga. State Conf. of the NAACP v. Fayette County Bd. Of Comm'rs*, 2015 U.S. Dist. LEXIS 101945 *34 (N.D. Ga. Aug. 3, 2015) (citing *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006)). The closer to the election,

---

[1] Available at http://www.arkansasonline.com/news/2016/feb/27/election-workers-see-record-turnout-201/?f=news-politics.

the higher this risk. *Id.* The hearing in this case is set a mere one day before the primary election.

Moreover, this complaint at such a late stage was entirely avoidable, as Mr. Rubio's placement on the primary ballot is no surprise to even casual political observers. In the complaint, Mr. Librace stated that the State published a list of candidates on November 9, 2015. (Compl. at 2). Rather than filing his complaint with this Court on November 10, 2015, he waited until just six weeks prior to the date of the well-publicized primary election date. At this late stage in the primary, disrupting the primary election process would violate the clear direction in *Purcell.*

The direction that courts should refrain from issuing election rulings close in time to the election appeared most prominently in the Supreme Court case *Purcell v. Gonzales*, and again as the common thread in a series of four orders the Court issued about a month before the last national elections. *See Husted v. Ohio State Conference of the NAACP*, 135 S. Ct. 42 (2014); *North Carolina v. League of Women Voters*, 135 S. Ct. 6 (2014); *Frank v. Walker*, 135 S. Ct. 7 (2014) (Alito, J., dissenting) ("There is a colorable basis for the Court's decision due to the proximity of the upcoming general election. It is particularly troubling that absentee ballots have been sent out…"); *Veasey v. Perry*, 135 S. Ct. 9, 10 (2014). This Court should follow the Supreme Court's guidance and refrain from issuing an election ruling so close in proximity to the election.[2]

---

[2] Arkansas's early voting for the Presidential Preference Primary began on February 16, 2016. The primary election is on March 1, 2016. *See* http://www.sos.arkansas.gov/elections/Documents/2016ElectionCalendar.pdf (last accessed February 27, 2016). Under the Military Voter Protection Act, ballots bearing Marco Rubio's name were mailed to military voters 45 days prior to the March 1, 2016 primary election. Granting the requested injunction would create chaos as military voters may have already cast their ballots and violate federal law. *See* 52 U.S.C. §

## II.    Plaintiff Has Failed To Properly Serve Senator Rubio With A Complaint And Summons As Required By Federal Rules Of Civil Procedure.

Plaintiff filed this action on February 3, 2016. However, as of the date of this filing, Senator Rubio has not been properly served with a copy of the Complaint nor with a summons.  In fact, Senator Rubio only discovered the existence of this action through third parties.

The Federal Rules of Civil Procedure are clear. Under Rule 4(c) of the Federal Rules of Civil Procedure, a summons must be served with a copy of the complaint. Moreover, the plaintiff is responsible for having the summons and complaint served within the time allowed by the Rules and must furnish the necessary copies to the person serving the documents. Fed. R. Civ. P. 4(c).  Here, there has been no complaint or summons served on Senator Rubio, and therefore this Court has no jurisdiction on Senator Rubio. *See Omni Capital Int'l v. Rudolf Wolff & Co., Ltd*., 484 U.S. 97, 104 (1987) ("Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied."); *Mississippi Publishing Corp. v. Murphree*, 326 U.S. 438, 444-45 (1946) ("Service of summons is the procedure by which a court having venue and jurisdiction of the subject matter of the suit asserts jurisdiction over the person of the party served."); *Pohlmann v. Bil-Jax, Inc*., 176 F.3d 1110, 1111 (8th Cir. 1999) (noting that jurisdiction over the defendant turned on whether defendant was amendable to the personal jurisdiction of the court and whether defendant was validly served).

---

20302(a)(8)(A) (requiring that in most circumstances states must transmit absentee ballots to military voters no later than 45 days prior to a federal election).

Actual notice of an action does not satisfy the requirements for proper service of process under Rule 4, nor does it eliminate the requirement for proper service of process. *See Young v. Mt. Hawley Ins. Co.,* 864 F.2d 81 (8th Cir. 1988); *Armco, Inc. v. Penrod-Stauffer Building Systems, Inc.*, 733 F.2d 1087 (4th Cir. 1984); *McGinnis v. Shalala*, 2 F.3d 548, 551 (5th Cir. 1993); *Mid-Continent wood Products, Inc. v. Harris*, 936 F.2d 297 (7th Cir. 1991); *Friedman v. Estate of Presser*, 929 F.2d 1151 (6th Cir. 1991); *McDonald v. United States*, 898 F.2d 466 (5th Cir. 1990). Accordingly, the fact that Senator Rubio discovered this action through third parties does not substitute for adequate service of process. Moreover, with such insufficient service of process, this Court lacks jurisdiction to over Senator Rubio. *See Omni Capital Int'l*, 484 U.S. at 104; *Mississippi Publishing Corp*, 326 U.S. at 444-45; *Pohlmann*, 176 F.3d at 1111.

The fact that the Plaintiff in this case is a pro se litigant is of no consequence. Pro se litigants are not excused from complying with court orders or substantive and procedural law. *See Farnsworth v. City of Kansas City*, 863 F.2d 33, 34 (8th Cir. 1988), cert. denied, 493 U.S. 820 (1989); *Am. Inmate Paralegal Assoc. v. Cline*, 859 F.2d 59, 61 (8th Cir.), cert. denied, 488 U.S. 996 (1988); *Burgs v. Sissel*, 745 F.2d 526, 528 (8th Cir. 1984).

In this case, even if the pro se Plaintiff were to properly serve Senator Rubio and cure this defect, such service of process would be futile as there are many other grounds for dismissal of this action given that Senator Rubio is clearly qualified to be President of the United States, Plaintiff lacks standing and raises a non-justiciable political question*, see* Fed. R. Civ. P. 12(b)(1), and failed to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). Specifically, when a court finds that service is insufficient

but curable, it generally should quash the service and give the plaintiff an opportunity to re-serve the defendant. *See, e.g.*, *Gregory v. United States Bankruptcy Court*, 942 F.2d 1498, 1500 (10th Cir. 1991). However, in this case, dismissal of Plaintiff's claim would be most appropriate because proper service would be futile. *Gregory*, 942 F.2d at 1500. In those instances, the Court considers whether, and against whom, this matter should simply be dismissed or whether plaintiffs should be given the opportunity to cure defective service after the court considers the grounds asserted for dismissal pursuant to Fed. R. Civ. P. 12(b)(6). *See id*.

III. **THIS COURT SHOULD DISMISS THE COMPLAINT BECAUSE THE SUPREME COURT HAS RULED THAT THE TERM NATURAL BORN CITIZEN MEANS A PERSON BORN IN THE UNITED STATES REGARDLESS OF THE PARENTS' CITIZENSHIP.**

A. **Standard Of Review.**

When reviewing a Motion to Dismiss under Fed. R. Civ. P. 12(b)(6), although this Court must accept as true all well-plead, non-formulaic and conclusory factual allegations contained in the complaint, this Court need not accept the complaint's legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

Plaintiff concedes that Senator Marco Rubio was born in the United States. (Compl. at 5). Senator Marco Rubio is therefore a natural born United States citizen. Senator Rubio is also 44 years of age and has resided in the United States in excess of fourteen years. Senator Rubio is therefore eligible to serve as President of the United States. *See* U.S. Const. art. II, § 1, cl. 5.

The United States Supreme Court in *United States v. Wong Kim Ark*, 169 U.S. 649 (1898), held that a person born in the United States to foreign born parents who were not Ambassadors are natural born citizens. The U.S. Supreme Court also recently

reaffirmed the notion that on questions of interpretations of the Constitution and federal laws, its decisions are the final word. *See James v. City of Boise,* 136 S. Ct. 685, 686 (2016) ("It is this Court's responsibility to say what a [federal] statute means, and once the Court has spoken, it is the duty of other courts to respect that understanding of the governing rule of law.") (alteration in the original).

Under the common law of England at the time of the American founding, under U.S. Supreme Court precedent, and under U.S. historical practice, anyone born in the United States, regardless of ancestry and immigration status of the parents, is a "natural born citizen" under the Constitution. It is undisputed that Senator Rubio was born in the United States to immigrant parents. Under the United States Constitution, Senator Rubio is a natural born citizen who is eligible to serve as President of the United States.

### B. Centuries Of Precedent Demonstrate That Senator Marco Rubio Is A Natural Born Citizen And Is Eligible To Be President.

The Constitution declares "No person, except a natural born Citizen, or a Citizen of the United States, at the time of the Adoption of this Constitution, shall be eligible to the Office of President." U.S. Const. art. II, § 1. The term "natural born citizen" is not defined in the Constitution. *See Wong Kim Ark*, 169 U.S. at 654. Therefore, to interpret the meaning of the phrase, courts routinely look to English common law at the time of the founding. *See Smith v. Alabama*, 124 U.S. 465, 478 (1888) ("The interpretation of the Constitution of the United States is necessarily influenced by the fact that its provisions *are framed in the language of the English common law*, and are to be read in the light of its history.") (emphasis added); *see also Ex parte Grossman*, 267 U.S. 87, 108-09 (1925) ("The language of the Constitution cannot be interpreted safely except by reference to the common law and to British institutions as they were when the instrument was framed and

adopted."). As is widely-recognized, "[t]he statesmen and lawyers of the Convention who submitted it to the ratification of the Conventions of the thirteen States, were born and brought up in the atmosphere of the common law, *and thought and spoke in its vocabulary.*" *Ex parte Grossman*, 267 U.S. at 109 (emphasis added).

    **C.**  **The Common Law Of England Interpreted Natural Born Subject To Mean All Persons Born In England Regardless Of Their Parents' Citizenship.**

The great British legal scholar, William Blackstone, divided subjects of the British crown into two categories, those who were natural born subjects and those who were aliens. Natural born subjects were all of those persons "born within the dominions of the Crown of England." 1 William Blackstone, *Commentaries* 354 (1765). As Blackstone explains, all persons born within the dominions of the Crown have "natural allegiance" to the Crown and that allegiance is established at birth because the infant cannot protect himself and requires the protection of the Crown. *Id*. "Natural allegiance is therefore a debt of gratitude; which cannot be forfeited, cancelled, or altered, by any change of time, place, or circumstance, nor by any thing but the united concurrence of the legislature." *Id*.

This 'debt of gratitude' owed to the Crown by every natural born subject cannot be forfeited, even if the subject moves outside the dominion of the Crown. Blackstone explains that a natural born subject may move outside the dominion of the Crown, and swear allegiance to another king, but this "entanglement" does not and cannot "[u]nloose those bands, by which he is connected to his natural prince." The allegiance of a natural born subject is perpetual. *See id*. at 357. Blackstone, in no unequivocal terms, explains the English common law of the time: "The children of aliens, born here in England, are,

generally speaking, natural born subjects, and entitled to all the privileges of such." *Id*. at 361.

By contrast, a foreign-born alien only became an English subject through "naturalization," which required an "act of parliament." *Id*. at 362. This process gives the person all of the same rights of citizenship as a natural born subject, except that only a natural born subject can serve in parliament or on the privy council. *Id*. at 362.

The U.S. Supreme Court has recognized that English common law understood a natural born subject to include "[e]very person born within the dominions of the Crown, no matter whether of English or of foreign parents, and, in the latter case, whether the parents were settled, or merely temporarily sojourning, in the country...." *See Wong Kim Ark,* 169 U.S. at 657; *see also id*. ("[A]ny person who (whatever the nationality of his parents) is born within the British dominions is a natural born British subject."); *id*. at 658 ("[T]herefore every child born in England of alien parents was a natural born subject, unless the child of an ambassador or other diplomatic agent of a foreign State, or of an alien enemy in hostile occupation of the place where the child was born.").

The sole exceptions to the natural born subject rule of English common law apply to children born to foreign diplomats or enemy parents during an occupation of British lands. *Id*. Thus the term "natural born subject" at British common law meant a "British subject who has become a British subject at the moment of his birth." *Id*.

Thus, it is indisputable that the British common law, a subject with which founders of the United States were intimately familiar, understood a "natural born subject" to be a person who is born within the British dominions, regardless of the parents' citizenship, and subject only to the two exceptions noted above. *See* Charles

Gordon, *Who Can Be President of the United States: The Unresolved Enigma*, 28 Md. L. Rev. 1, 6 (1968).

### D. The Constitutional Convention Added This Section To Protect Against Ambitious Foreigners.

While participating in the constitutional convention, John Jay wrote a letter to George Washington stating the following:

> Permit me to hint, whether it would be wise and seasonable to provide a strong check to the admission of Foreigners into the administration of our national Government; and to declare expressly that the Command in Chief of the American army shall not be given to nor devolve on, any but a natural born citizen.

Christina S. Lohman, *Presidential Eligibility: the Meaning of the Natural-Born Citizen Clause*, 36 Gonz. L. Rev. 349, 352 (2000). John Jay's motivation for this letter seems to stem from a suspicion that the Convention was considering Baron Von Steuben for President or that the Convention was contemplating establishing a monarchy with a foreign ruler. *Id*. There is no mention that the clause was meant to prevent the children of immigrants, born in the United States, from becoming President. The natural born citizen clause was adopted, in its original formulation without debate. *Id*. at 353.

Later, Justice Story confirmed the understanding that the purpose of the natural born citizen requirement was to prevent ambitious foreigners from vying for the office of the President as well as preventing foreign governments from interfering with U.S. presidential elections. Neal Katyal & Paul Clement, *On the Meaning of "Natural Born Citizen"*, 128 Harv. L. Rev. F. 161, 163 (2015) (citing 3 Joseph Story, Commentaries on the Constitution of the United States § 1473, at 333 (1833)). Justice Story never

suggested that the clause prevented the children of immigrants born in the United States from becoming President.[3]

### E. The U.S. Supreme Court Adopted The British Common Law View That All Persons Born In The United States Are Natural Born Citizens.

The Supreme Court in *Wong Kim Ark* conducted an extensive and thorough review of the common law of England and U.S. case law to determine the meaning of the term "natural born citizen." Although *Wong Kim Ark* was decided on Fourteenth Amendment grounds, the Supreme Court "[e]xhaustively examine[s] the British common law, the source by which the constitutional Framers apparently derived the 'natural born' terminology." *See* Christina S. Lohman, *Presidential Eligibility: the Meaning of the Natural-Born Citizen Clause*, 36 Gonz. L. Rev. 349, 357 (2000). The Court analyzed English common law to ascertain whether Wong Kim Ark, a man born in the United States to Chinese immigrant parents, was a U.S. citizen by birth. *Id*. at 360.

### a. The Term Natural Born Citizen And Its Meaning During The Colonial Period Through The Founding Period.

As noted in *Wong Kim Ark*, Justice Marshall's 1804 opinion in the *Charming Betsey,* 2 Cranch, 64, 119, assumed that citizenship could be obtained by birth or naturalization, and that all persons born in the United States were United States citizens. *See Wong Kim Ark*, 169 U.S. at 658-59. Subsequently, in *Inglis v. Sailors' Snug Harbor*, (1830) 3 Pet. 99, the Supreme Court addressed the citizenship of a man born in New York City around 1776. *Wong Kim Ark*, 169 U.S. at 659. The Court recognized that it was universally acknowledged that all persons born in the Colonies of the United States,

---

[3] In fact, at the time Justice Story wrote his Commentaries on the Constitution, Andrew Jackson – the son of Irish immigrants to the United States – was serving as President of the United States.

while under the rule of the British Crown, were considered natural born subjects of Great

Britain. *Wong Kim Ark*, 169 U.S. at 659. The Court also noted that Justice Story, in his

*Inglis* opinion, held that "[n]othing is better settled at the common law than the doctrine

that the children, even of aliens, born in a country, while the parents are resident there

under the protection of the government, and owing a temporary allegiance thereto, are

subjects by birth." *Wong Kim Ark*, 169 U.S. at 660 (quoting *Inglis v. Sailors' Snug*

*Harbor,* (1830) 3 Pet. 164).

Thus, through the mid-nineteenth century, there was no question that persons born

in the United States to foreign parents (who were not diplomats or hostile, occupying

enemies) were citizens of the United States by virtue of their birth. *See Wong Kim Ark*,

169 U.S. at 664 (citing *Lynch v. Clarke*, 1844 N.Y. Misc. LEXIS 1 *43 (N.Y. Ch. 1844),

a case in which the Supreme Court ruled that a woman born in the United States to

British parents temporarily visiting the United States was a citizen at birth.). The *Lynch*

court said:

> And the constitution itself contains a direct recognition of the subsisting
> common law principle, in the section which defines the qualification of the
> President. "No person except a natural born citizen, or a citizen of the
> United States at the time of the adoption of this constitution, shall be
> eligible to the office of President," *The only standard which then existed,*
> *of a natural born citizen, was the rule of the common law, and no different*
> *standard has been adopted since*. **Suppose a person should be elected**
> **President who was native born, but of alien parents, could there be**
> **any reasonable doubt that he was eligible under the constitution? I**
> **think not.** The position would be decisive in his favor that by the role of
> the common law, in force when the constitution was adopted, he is a
> citizen.

*Lynch*, 1844 N.Y. Misc. LEXIS 1 *43 (emphasis added).

**The Meaning Of The Term Natural Born Citizen And Its Meaning During The Middle Of The Nineteenth Century.**

In the infamous case of *Dred Scott v. Sanford*, Justice Curtis, who dissented from the Court's judgment, interpreted the Natural Born Citizen Clause to mean that citizenship is acquired at birth, a concept with which the founding fathers were intimately familiar. *See Wong Kim Ark*, 169 U.S. at 660 (quoting *Scott v. Sandford*, 60 U.S. 393, 576 (1857) (Curtis, J., dissenting)).

Nine years later, Justice Swayne similarly concluded that all persons born in the United States are natural born citizens. *Wong Kim Ark*, 169 U.S. at 662. Justice Swayne explained that this view was the common law of England as well as the common law of the United States. *See id*.

The Fourteenth Amendment's guarantee of citizenship to all persons born in the United States was not intended to create a new rule; rather, it was intended to remove any doubt that *all* persons born in the United States, regardless of race, ancestry, previous servitude, etc., were citizens of the United States. *See id*. at 676.

The common law view of "natural born citizen," as reflected in the Fourteenth Amendment, was codified by statute in 1866. The Supreme Court later noted that this "first statutory recognition and concomitant formal definition of the citizenship status of the native born" read: "All persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States." *Rogers v. Bellei*, 401 U.S. 815, 829 (1971). During the debate surrounding the Civil Rights Act of 1866, Senators Trumbull and Cowan engaged in a colloquy over the meaning of 'All persons born in the United States'. *See id*. at 697. This discussion centered on whether the children of German or Chinese citizens born in the

United States satisfied the statutory definition. Senator Trumbull's response was "Undoubtedly." *See Wong Kim Ark*, 169 U.S. at 697. Senator Johnson understood the amendment to mean that "[a]ll persons born in the United States, and not subject to a foreign power, shall, *by virtue of birth*, be citizens." *See id*. This legislative history confirms that the English common law, including the historic limitations of *jus soli*,[4] namely that those persons born in England but who were foreign diplomats or foreign enemies were not citizens, was now codified in federal law. Thus, the Court explained that "[t]he fundamental rule of citizenship by birth within the dominion of the United States, *notwithstanding alienage of parents*, has been affirmed, in well considered opinions of the executive departments of the Government, since the adoption of the Fourteenth Amendment of the Constitution." *Id*. at 688 (emphasis added). The phrase "not subject to any foreign power" was not intended to deny, for the first time in American history, citizenship to those children born in the United States to foreign parents but rather to simply reflect the well-known exceptions to the *jus soli* doctrine. *See id*. at 688.

This extensive background informed the Supreme Court in *Wong Kim Ark*. In 1873, Wong Kim Ark was born in San Francisco, California to Chinese citizens who were domiciled in San Francisco. *United States v. Wong Kim Ark*, 169 U.S. at 652. Seventeen years later, Wong Kim Ark and his family departed for China. *See id*. at 653 During this visit, Wong Kim Ark intended to return to the United States. *See id*. He

---

[4] The term *jus soli* is Latin for 'right of the soil' and is the doctrine of citizenship that says "[a] child's citizenship is determined by the place of birth. This is the U.S. rule as affirmed by the Fourteenth Amendment." Black's Law Dictionary 880 (8th ed. 2004). By contrast, *jus sanguinis*, is Latin for 'right of blood' and is the doctrine of citizenship where a "[c]hild's citizenship is determined by the parent's citizenship. Most nations follow this rule." *Id*.

visited China again in 1894 and, upon his return to the United States, the customs officer denied him entry stating that Wong Kim Ark was not a citizen of the United States. *See id*. The question presented to the Court was "[w]hether a child born in the United States, of parents of Chinese descent, who, at the time of his birth, are subjects of the Emperor of China, but have a permanent domicile and residence in the United States, and are there carrying on business, and are not employed in any diplomatic or official capacity under the Emperor of China, *becomes at the time of his birth a citizen of the United States...*" *Id*. (emphasis added). The Court answered the question in the affirmative. The Court concluded that Wong Kim Ark was a U.S. citizen by birth in the United States. *See id.* at 704.

The Court further affirmed that "[t]he fundamental rule of citizenship by birth within the dominion of the United States, *notwithstanding alienage of parents*, has been affirmed, in well considered opinions of the executive departments of the Government, since the adoption of the Fourteenth Amendment of the Constitution." *Id*. at 688 (emphasis added). The Supreme Court held that all persons born in the United States, even to foreign parents, are natural born citizens of the United States. *Id*. at 674-75. In very clear language, the Court explained:

> To hold that the Fourteenth Amendment of the Constitution excludes from citizenship the children, born in the United States, of citizens or subjects of other countries, would be to deny citizenship to thousands of persons of English, Scotch, Irish, German or other European parentage, who have always been considered and treated as citizens of the United States.

*Id.* at 694.

**c.** **Modern Jurisprudence Concerning The Natural Born Citizen Clause.**

*First*, The U.S Supreme Court has adopted Blackstone's dichotomy of citizenship, namely, citizenship is obtained either by birth or by naturalization. For those who are born in the United States, they are, at once, citizens of the United States and do not require naturalization. *See Miller v. Albright*, 523 U.S. 420, 423-424 (1998); *see also Wong Kim Ark*, 169 U.S. at 702 ("[T]wo sources of citizenship and two only: birth and naturalization."); *see also Schneider v. Rusk*, 377 U.S. 163, 165-66 ("We start from the premise that the rights of citizenship of the native born and of the naturalized person are of the same dignity and are coextensive. The only difference drawn by the Constitution is that only the "natural born" citizen is eligible to be President." And recognizing that the rights of the native born come from the Fourteenth Amendment).[5]

*Second*, courts throughout the United States have recently considered challenges to Barack Obama's eligibility to serve as President of the United States. Courts that have addressed the merits of these cases have routinely rejected these challenges and granted Motions to Dismiss. *See, e.g., Tisdale v. Obama*, No. 12-036, 2012 U.S. Dist. LEXIS 181036 *2-3 (E.D. Va. Jan. 20, 2012) (granting motion to dismiss claim that presidential candidates Barack Obama, Mitt Romney, and Ron Paul were ineligible to appear on the ballot because each candidate had one parent who was not a U.S. citizen and holding that "It is well settled that those born in the United States are considered natural born citizens.") (citing *Wong Kim Ark*, 169 U.S. at 702 ("Every person born in the United States and subject to the jurisdiction thereof, becomes at once a citizen of the United

---

[5] This further demonstrates that there is no difference between the Natural Born Citizen Clause and the Fourteenth Amendment's provision that all persons born in the United States and subject to the jurisdiction thereof are U.S. citizens.

States.")); *Ankeny v. Governor of Indiana*, 916 N.E.2d 678, 688 (Ind. Ct. App. 2009) ("Based upon the language of Article II, Section 1, Clause 4 and the guidance provided by *Wong Kim Ark*, we conclude that persons born within the borders of the United States are "natural born Citizens" for Article II, Section 1 purposes, regardless of the citizenship of their parents."); *Hollander v. McCain*, 566 F. Supp. 2d 63, 66 (D.N.H. 2008) ("Those born 'in the United States, and subject to the jurisdiction thereof,' U.S. Const., amend. XIV, have been considered American citizens under American law in effect since the time of the founding.") (citing *Wong Kim Ark*, 169 U.S. at 674-75); *see also Strunk v. New York State Bd. of Elections*, No. 6500/11 2012 N.Y. Misc. LEXIS 1635 (N.Y. Sup. Ct. 2012); *see also N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (stating that in the independent-expenditure only committee context "Few contested legal questions are answered so consistently by so many courts and judges.").

Nearly identical administrative complaints about Senator Rubio have been presented to executive branch election authorities in four states this election cycle, and all have been dismissed. *See Graham v. Rubio*, No. 15 SOEB GP 528, slip op. at 2 (Ill. State Bd. Of Elec. Feb. 1, 2016); *Laity v. Rubio*, et al., No. BLC 2015-4, slip op. (N.H. BLC 2015); *Carter v. Rubio*, Cause No. 2016-2 (Ind. Elec. Comm. Feb. 19, 2016); *Laity v. Rubio, et al.*, (N.Y. State Bd. Of Elec. Feb. 23, 2016). Mr. Librace's contention that a natural born citizen is one who is born in the United States to parents who are both U.S. citizens is wrong. (Compl. at 5). As stated *supra*, a natural born citizen is one who is born in the United States to parents who are not Ambassadors or enemies.

**d.**    **Historical Practice In The United States Confirms This View Because Six Presidents Were Born In The United States To At Least One Parent Who Was Not A Citizen.**

Finally, Senator Rubio's status as a candidate for President who is a natural born child of immigrant parents is not unusual. Both parents of President Andrew Jackson were Irish immigrants. The fathers of Presidents James Buchanan and Chester Arthur were Irish immigrants. The mothers of Presidents Woodrow Wilson and Herbert Hoover were immigrants from England and Canada respectively. President Obama, a man born in the United States to an American mother and a father from Kenya, is also a natural born citizen. *See, e.g., Strunk v. New York State Bd. of Elections*, No. 6500/11 2012 N.Y. Misc. LEXIS 1635 *41 (N.Y. Sup. Ct. 2012). Mr. Librace now joins the list of persons seeking to reverse centuries of precedent.

Mr. Librace's contention that both parents must be citizens of the United States in order for their children, born in the United States, to be "natural born citizens" is wrong as a matter of historical practice. Mr. Librace cannot be correct, because at least six of our Presidents have held that office after being born in circumstances identical to that of Senator Rubio. Mr. Librace's assertion that in the history of the United States no other U.S. presidential candidate was the child of two immigrant parents is factually inaccurate and legally irrelevant. (Compl. at 5). As stated *supra*, President Andrew Jackson was the son of Irish immigrants. *Strunk* No. 6500/11 2012 N.Y. Misc. LEXIS 1635 *41. And, as stated *supra*, a person born in the United States to parents who are not Ambassadors is a natural born citizen. *See, e.g., Wong Kim Ark*, 169 U.S. at 662-63; *see also id*. at 715 (Fuller, C.J., dissenting) (noting that the majority's reasoning means that those persons

born in the United States to non-citizen parents are natural born citizens and otherwise eligible to serve as President).

Finally, Senator Rubio was in fact born in the United States, as Mr. Librace concedes. (Compl. at 5). This concession should end this matter as Senator Rubio is, by longstanding understanding, law and practice, a natural born citizen of the United States.

### F. Librace's Characterization Of The Naturalization Acts Is Mistaken As Applied to Senator Rubio.

Mr. Librace references the Naturalization Acts of 1790 and its subsequent amendments. It should be noted that the term natural born citizen does not appear in the Naturalization Act of 1795, 1802, and 1855, or in any of the statutory sections cited by Mr. Librace. (Compl. at 4-5). In fact, the statutory citations all refer to children of citizens born abroad. *See generally* 8 U.S.C. §§ 1431 and 1433. This is not Senator Rubio's situation, as Mr. Librace admits. (Compl. at 5). Senator Rubio was born in Florida and is therefore a natural born U.S. Citizen.

The term natural born citizen does appear in the Naturalization Act of 1790, albeit only once. The term is used to say that those persons born *abroad* to U.S. citizen parents are considered natural born citizens. *See* The Naturalization Act of 1790, 1 Stat. 103, Chap. 3, § 1 ("And the children of citizens of the United States, that may be born beyond sea, or out of the limits of the United States, shall be considered as natural born citizens…."). Mr. Librace admits that Senator Rubio was born in the United States (Compl. at 5).[6] It is therefore strange that Mr. Librace thinks that Senator Rubio would

---

[6] Mr. Librace demonstrates that he is unaware of even the most basic distinctions of immigration law. *Compare* Compl. at 2 (stating that Senator Rubio is a naturalized

rely on a statute that applies only to those persons who are born abroad. The Naturalization Act of 1790, or any of the naturalization acts for that matter, has no applicability to Senator Rubio.

## CONCLUSION

This Court should dismiss Mr. Librace claims. Mr. Librace lacks standing to bring his claim; his claim is procedurally defective; he failed to properly serve the Complaint in this matter; Mr. Librace's claim raises a non-justiciable political question; Mr. Librace's contentions are erroneous as a matter of law; and entertaining Mr. Librace's argument would jeopardize centuries of precedent and deem at least six presidents ineligible for office. Senator Rubio is a natural born citizen of the United States and he is eligible to serve as President of the United States. Mr. Librace's complaint should be dismissed.

Respectfully submitted on February 28, 2016

_____
Jason Torchinsky (Va. Bar 47481)
Holtzman Vogel Josefiak Torchinsky PLLC
45 North Hill Drive, Suite 100
Warrenton, VA 20186
(540) 341-8808
fax: (540) 341-8809
jtorchinsky@hvjt.law

*Counsel for Senator Marco Rubio*

---

citizen) *with* Compl. at 5 (stating that Senator Rubio was born in Florida). One who is born in the United States is not a naturalized citizen, but a citizen by birth. *See* U.S. Const. amend. XIV, § 1 ("All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States.").

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2016, I filed the foregoing document with the Court's ECF system. I have mailed first class the foregoing document to the following:

> David Librace
> 203 South 7th Street
> West Helena, AR 72390-3019

In addition, because of the timing of this matter and the hearing, I electronically emailed the foregoing to David Librace at dlibrace@yahoo.com.

Dated:    February 28, 2016

_____
Jason Torchinsky (Va. Bar 47481)
Holtzman Vogel Josefiak Torchinsky PLLC
45 North Hill Drive, Suite 100
Warrenton, VA 20186
(540) 341-8808
fax: (540) 341-8809
jtorchinsky@hvjt.law

*Counsel for Senator Marco Rubio*